L. MASINI, Appellant, *v*. ANGELO QUILICI AND LOUISE QUILICI, Respondents.

No. 3588

May 26, 1950.                                       218 P.2d 946.

*Andrew L. Haight,* of Fallon, and *Leslie A. Leggett,* of Reno, for Appellant.

*John R. Ross,* of Carson City, for Respondents.

## OPINION

By the Court, HORSEY, C. J.:

The appellant, L. Masini, has appealed to this court from the judgment made and entered by the First judicial district court of the State of Nevada, in and for the

county of Lyon, on the 4th day of May, 1949, and from the order denying appellant's motion for a new trial.

Some of the essential facts, concerning which there is no controversy, may be stated, in effect, from the evidence, as follows:

In the latter part of October and the first part of November, 1945, the respondents, Angelo Quilici and Louise Quilici, who were husband and wife, decided to sell what was, and is, known as the Quilici Ranch, located about one mile south of the city of Yerington, county of Lyon, State of Nevada. Soon thereafter, the respondents inserted an advertisement in a newspaper, the Reno Evening Gazette, offering to sell said ranch. The appellant, Masini, and the respondents, the Quilicis, had known each other for a long time, and on one occasion, after such advertisement had been inserted in such newspaper, Louise Quilici, upon making a trip to Hawthorne, Nevada, visited Masini's store; there she delivered some chickens, and upon that occasion Masini mentioned that he was much interested in land and ranch property and their values. Shortly thereafter, Angelo Quilici told L. Masini that respondents would be willing to sell their said ranch.

The appellant, on the 22d day of November, 1945, visited the respondents at the said Quilici Ranch. While at the ranch, appellant personally inspected the said ranch during that morning, and they discussed the terms of sale. Masini made an inventory of all the crops, tools, equipment, improvements and other personal property located and situated upon the said ranch. They discussed the price, Masini suggesting $35,000, and Angelo Quilici insisting upon $40,000. And, finally, an oral agreement for the sum of $40,000 was mutually determined upon and tentatively accepted, to be followed by the drafting of a written agreement. Mr. F. H. Koehler, an attorney at Yerington, Nevada, was requested to perform such service. It is not certain whether Masini alone, after such oral agreement at the ranch, first contacted Mr. Koehler, requesting him to act, later that

same day, or whether both Angelo Quilici and Masini came to Mr. Koehler's office; but, in any event, later on that afternoon Masini, Angelo Quilici and Louise Quilici all came to Mr. Koehler. All the parties executed the written agreement in the said attorney's residence that afternoon, about, or shortly after, 4 p. m., on said November 22, 1945, the actual drafting being by Mr. Koehler. The testimony does not disclose definitely whether it was understood Mr. Koehler was acting as attorney for Masini or for all of the parties, which is probably immaterial. It was indicated by all the parties that the agreement was to be held by Mr. Koehler and deposited, the next morning, at the bank at Yerington, Nevada. The written agreement above mentioned was as follows:

"Memorandum of Agreement.

"1.　L. Masini buyer—

"2.　Angelo Quilici & Louise Quilici, sellers—

"3.　Buyer agrees to buy and sellers to sell 200 acres of land more or less owned by them and located about one mile south of Yerington, Nevada plus all cattle, machinery, crops, buildings, pigs, chickens, hay, grain, potatoes, turkeys and all other farm crops, materials and supplies on the ranch on this date, estimated to be

| | |
|---|---|
| 73 head of cattle | 70—head of hogs |
| 300 ton of hay | 100 turkeys |
| 50 ton of spuds | 125 chickens |
| 1 truck Chev. | 600 sacks of barley |
| 1 tractor case | 1 power mower |
| 1 hay-bailer | 3 or 4 plows |
| 8 horses | 1 side delivery rake |
| grain drill | 2 horse mowers |

Misc. small tools and household goods.

"4.　Sellers retain personal belongings, wine, canned goods, piano, blankets, Willis property stored in attic, 3 or 4 rocking chairs and 4 or 5 other chairs.

"5.　Full purchase price $40,000.00 payable $5,000.00 upon execution of this agreement and $35,000.00 upon transfer of good title to buyer.

"6.  Title insurance at buyers cost.

"7.  Deeds, stamps, bill of sale at sellers cost.

"8.  FH Koehler is hereby authorized to order title search and insurance, make deeds, and bill of sale and procure revenue stamps.

"9.  Taxes to be prorated as of today.  Insurance on place goes with deal.

"10.  All water and ditch rights included in property sold.

"Dated November 22, 1945 Louise Quilici

Angelo Quilici

"Witness—F. H. Koehler  L. Masini"

The agreement discloses that the buyer was L. Masini, and the sellers were Angelo Quilici and Louise Quilici. It is recited, in paragraph 3 of the agreement, that: "Buyer agrees to buy and sellers to sell 200 acres of land more or less *owned by them,*" (that is, in effect, by the Quilicis), and, referring to the testimony of L. Masini, there was no reference or mention made by any of the said parties at the time of the execution of the agreement, or prior thereto, as to the fact that Mary Scossa, an incompetent sister of Louise Quilici, owned an interest in said ranch. (Italics ours.)  Masini's testimony, at one point, was clear to the effect that he was perspiring, and that as soon as the agreement had been signed, he, Masini, went out on the porch at the Koehler residence, and, after a few minutes, he returned, and that he then and there casually overheard a conversation between Louise Quilici and Koehler, and in which she said, in effect, that she, Louise Quilici, was trustee for said Mary Scossa, and that she could sell the property, and that this was the first intimation the appellant had received that the respondents did not own the property; that Masini did not hear Louise Quilici say anything at that time in regard to it being necessary to have *any approval of the court* in order to sell, as guardian, Mary Scossa's one-half interest in the ranch.  Such statement of Masini is supported, it is believed, by certain of the

statements of Louise Quilici in the respondents' answer and cross-complaint, filed June 22, 1946, which she verified, and in which she stated, in paragraph IV of respondents' separate, second and distinct defense, the following: "That on the 14th day of December, 1945, the defendant, Louise Quilici, as guardian of the person and estate of Mary Scossa, an incompetent person, *first learning* that she could not sell and convey the undivided interest of her ward in and to the real property referred to in the agreement of sale, filed her petition in the above entitled Court praying for an order to sell all of the right, title and interest of the said Mary Scossa in the real and personal property referred to in the agreement of sale." (Italics ours.)

We are mentioning that important statement on the part of Louise Quilici in order to bring out clearly that, if she was then truthful in her testimony, she *first learned* on December 14, 1945, that as guardian she, by her own action, could not sell such interest, and, therefore, it became necessary for her, in the above-mentioned petition, to petition "for an order to sell all of the right, title and interest of the said Mary Scossa."

Furthermore, none of Louise Quilici's allegations in her answer and cross-complaint state more than to indicate or contend, in effect, that because she fully believed she had the right to sell such interest, as guardian, there was no occasion for her to inform Masini *before the agreement was executed,* on November 22, 1945, that approval of the court was essential, and, in fact, she could not have done so, not knowing it herself until December 14, 1945, at which time she *first learned* of same. There is no statement, therefore, at all alleging in said answer and cross-complaint that the other respondent, Angelo Quilici, was informed, on November 22, 1945, or at any time prior to the time when such petition to sell the interest of Mary Scossa was filed, December 14, 1945, that Louise Quilici was required to obtain from the court an order to approve the sale as

such guardian in the matter of the guardianship of Mary Scossa.

And, as we view the theory of the respondents' allegations in their answer and cross-complaint, they had no intention or thought at that time of contending otherwise than set forth, generally, therein to the effect that Louise Quilici was not informed prior to December 14, 1945, as to approval of the court being necessary, or it may be said, she was ignorant or mistaken in law or fact, or both, as to such matter, and that, being surprised and *first learning* of such requirement, she promptly thereafter proceeded to obtain such order to sell such incompetent sister's interest. By such further allegation in said above-mentioned paragraph IV it was alleged, however, that for the reasons set forth in the last sentence of said last-mentioned paragraph: "That after said petition was duly noticed the same was heard on the 30th day of January, 1946, at which time the Court entered its order denying to the guardian, Louise Quilici, one of the defendants herein, the authority to sell the interest of the incompetent in the real and personal property to the plaintiff."

As to that subject, and particularly the allegations contained in the "Petition for authority to sell ward's estate and for order of sale," and the alleged statements or reasons whereby such petition was denied (same being "Order denying petition for sale of real property," filed February 13, 1946), same will be further referred to and discussed in this opinion, in relation to the question of the good faith or the bad faith and fraud of the respondents as to the alleged guardianship proceedings and the result thereof. But as to the present reference or mention in relation to respondents' answer and cross-complaint and the facts alleged therein and the theories presented, we apprehend that the gist and substance of respondents' contentions may be summarized as follows:

1. Louise Quilici failed to inform said Masini at the time of or prior to the execution of the agreement, November 22, 1945, that the sale of Mary Scossa's

interest must be sanctioned and approved by the court, because she only learned (as stated in the answer and cross-complaint) of same long subsequent to that date, and not until December 14, 1945, and that, therefore, she was perhaps mistaken in believing that she could act alone and make the sale, but that such failure on her part thus to disclose such fact was not intentional, and, hence, she should, in equity, be excused, upon the basis of her misconception or mistake of fact or law, or both, there being no fraudulent misrepresentation in that respect.

2. That, there being no actual or constructive fraud, respondents should be excused by reason of the fact that upon the petition for order to sell Mary Scossa's interest the proper statements were presented by respondents or their attorney, but due to reasons and causes inherent in the situation, the court declined to order such sale, were justified in so doing, and that, without any misrepresentation on the part of the respondents, the carrying through of such sale became, was, and is, impossible.

3. And, based upon such alleged inability of performance, and upon the denial of such order to sell, the respondents, on February 13, 1946, were entitled to consider the agreement at an end, and, upon returning to the appellant, Masini, the sum of $4,000 ($5,000 paid by Masini to the Quilicis upon the purchase price, less $1,000, which as to certain hay, had been paid back to Masini, leaving a net of $4,000), and its receipt by Masini, that respondents were entitled to have the agreement rescinded.

In that connection, it appears that on February 7, 1946, a letter was written, registered and mailed in the United States post office at Carson City, Nevada, by John R. Ross, Esq., attorney for respondents (plaintiff's exhibit A in case No. 3274 in the First judicial district court of the State of Nevada, in and for Lyon County), said letter being incorporated in this opinion, and being in words and figures as follows:

"JOHN R. ROSS
"Attorney at Law
"Sweetland Building
"Carson City, Nevada
"February 7, 1946
"Registered Return Receipt Requested.
"Lawrence Masini
"Hawthorne, Nevada
"Re: Quilici-Masini
"Dear Lawrence:

"Enclosed herewith find check dated January 30th, drawn to your favor by Louise Quilici in the amount of $4,000.00. This is repayment to you of the deposit you made with Louise on November 22, 1945. The deposit was in the amount of $5,000.00, but I understand that you have already received $1,000.00.

"You are informed that inasmuch as the agreement of November 22nd was predicated upon the proposition that the property was to be sold in its entirety, which can not be done by reason of the Court refusing to permit the sale of the incompetent's undivided one-half interest on the basis of your offer, Louise Quilici considers the agreement of no legal force or effect.

"Yours sincerely
"/s/ John R. Ross
"John R. Ross

"JRR/m
"encl 1"

The letter to Masini by John R. Ross, Esq., discloses that the inclosed check was intended as a repayment, in the amount of $4,000, to the appellant, Masini, of the part payment of $5,000 to respondent Louise Quilici, on November 22, 1945, by Masini, upon the execution of the agreement of that date (the respondents' understanding being that the $4,000 check, instead of a check of $5,000, was because of the fact that $1,000 had been repaid to Masini by the Quilicis in regard to the transaction as to certain hay), and which agreement, accord-

ing to said letter, Louise Quilici considered of no legal force or effect.

Suffice it to say that it appears from the testimony that the Quilicis tendered the said $4,000 check, by means of the said letter from Mr. Ross to Masini, but that the return of such sum was refused by Masini, and by him returned to the Quilicis, due to the contention of said appellant that such return to Masini would have operated to make effective the unlawful alleged repudiation by the respondents of their agreement.

In further consideration of the allegations of respondents' answer and cross-complaint, and particularly referring to paragraph VI of same, the allegations of said paragraph VI are as follows: "Defendants admit all of paragraph VI of the complaint, except that they specifically deny that they 'did fraudulently and in bad faith then and there suppress and conceal from the plaintiff the fact that they were not the owners of the entire interest in the real estate and that the said Mary Scossa owned an interest therein.' In this connection defendants believed that they, and particularly the defendant Louise Quilici, could sell and convey the undivided interest and estate of the incompetent, Mary Scossa, under her general powers as guardian of the person and estate of the incompetent, being required only to thereafter report her action to the Court and to pay over and into the estate of the incompetent one-half of the purchase price of the real and personal property referred to in the agreement of sale."

The meaning and effect of said allegations make clear that, in denying the statement embraced therein in which the appellant, in his complaint, had stated that respondents "did fraudulently and in bad faith then and there suppress and conceal from the plaintiff the fact that they were not the owners of the entire interest in the real estate and that the said Mary Scossa owned an interest therein," the respondents made such denial in the form and effect that would negative same as an

*entire* allegation, containing the two essential propositions included in the clause, that, (1) there was suppression and concealment to the effect that they were not the owners of the entire interest, and, (2) that they did so (suppress and conceal same) fraudulently. Obviously, the respondents were fully conversant with the effect of pleading negative allegations in such a manner. Such a form of allegation is, in pleading, considered elementary. The reason of such form of allegation, therefore, was clearly apparent, as shown by the second sentence of said paragraph VI, namely: "In this connection defendants believe that they, and particularly the defendant Louise Quilici, could sell and convey the undivided interest and estate of the incompetent, Mary Scossa, under her general powers as guardian of the person and estate of the incompetent, being required only to thereafter report her action to the Court and to pay over and into the estate of the incompetent one-half of the purchase price of the real and personal property referred to in the agreement of sale."

From the facts and circumstances shown in the pleadings, it has been contended repeatedly, particularly by Louise Quilici, that she, Louise Quilici, fully believed that she could convey the one-half interest of her sister in the real estate, and that on *first learning* she could not do so, she, therefore, petitioned for a sale, as guardian of Mary Scossa, necessitating the approval of the court.

As hereinbefore stated, she alleged in said second sentence of paragraph VI, in effect, that she should be excused because of her misconception or mistake; that, in effect, she impliedly, if not expressly, conceded such mistaken viewpoint, and that, therefore, of course, as she contended, she failed to disclose a situation of which she was actually unaware until she *first learned* differently, and that then, upon *first learning* what was required, that is, that the approval of the court was necessary, she promptly proceeded accordingly. Necessarily, in order to show good faith, she was, therefore, impelled to rely, in effect, upon her misconception or mistake, as her

excuse therefor. Same is in the nature of confession and avoidance, that is, that she did not disclose Mary Scossa's interest because she believed it unnecessary. Relying upon her contention in that regard, it could not well have been otherwise. Hence in said answer of respondents they alleged "defendants believed that they * * *." That is to say, she thus "suppressed and concealed," but did so honestly, in failing to disclose such necessity of disclosing Mary Scossa's interest. The respondent, Louise Quilici, thus, by denying the two propositions as a single negative, admitted the "suppressing and concealment," which, under the facts, she could not well or truly deny, but did deny the other of the negative propositions, namely, that she did so fraudulently and in bad faith. This allegation in said paragraph VI of the answer and cross-complaint remains respondents' contention. In respondents' "Separate, Second and Distinct Defense Defendants Allege," and in paragraph III thereof, the said defendants (respondents) again reiterated such belief on her part to the effect that she believed that, "under her general powers as guardian of the person and estate of Mary Scossa, an incompetent person, she could contract for the sale of and sell and convey all of the undivided interest of her ward in and to the real and personal property referred to in the agreement of sale. The defendants believing such to be the law and the fact, entered into said agreement of sale with the plaintiff."

We should bear in mind that it was not on *November 22, 1945,* upon which date the agreement was executed, but was on the later date, namely, December 14, 1945, upon which Louise Quilici *first learned* that she could not sell and convey such interest of her ward. The important dates involved are significant. In each and all of the remaining "Separate and Distinct Defenses" of respondents, the basic conception and theory of respondents was, and continued to be, that Louise Quilici, not having the slightest idea at the time of the execution of the agreement, November 22, 1945, that she was required

to do other than to convey the said interest as the guardian of her incompetent sister, she continued so to believe until the said petition in the matter of the guardianship, petitioning for authority to make such sale, was, or was about to be, formulated, presumably by reason of the advice of her attorney, John R. Ross, Esq. It was that petition, as above stated, and which Louise Quilici verified and filed on December 14, 1945, and the conversation and discussion which occurred, presumably, between Mrs. Louise Quilici and Mr. Ross, which served to apprise or inform her that, in effect, she had been under the misconception that she, as such guardian of Mary Scossa's said interest in said property, could sell and convey same, but she thus had ascertained that, instead, it would be, and had then become, and was necessary that she present such petition and such proceedings as were essential and proper. As hereinbefore set forth, she stated in her said answer and cross-complaint, June 20, 1946, filed June 22, 1946, exactly seven months after the conversation in connection with the preparation and execution of the agreement at Mr. Koehler's residence on November 22, 1945, and has repeatedly alleged, the same theory and conception of fact.

The several defenses of the answer and cross-complaint were largely affirmative defenses, and, in their nature, were by way of confession and avoidance. Such defenses, which commence with the first thereof and include the second, third, fourth and fifth of such separate and distinct defenses, did not depart from or change such original theory as alleged in paragraph VI of the first defense. The substance of the pleading was, consistently, that Louise Quilici did not conceive that she was required to seek approval of the court to make the sale, that it had not even occurred to her, because she had the belief in her mind that, as guardian, she could herself make the sale and convey the interest to Masini, and that, so believing, she did not conceive any reason or need to mention the matter to him. Her testimony, adduced by her thereafter at the trial, as shown by volume II of the

bill of exceptions, did not occur until April 28, 1948, about two years and five months after the conversation and execution of the agreement, November 22, 1945, and one year and about ten months after the date the answer and cross-complaint was filed, namely, June 22, 1946.

Masini, in his earlier testimony at the trial, on February 2, 1948, and in his further testimony on April 28, 1948, had stated that he did not recollect or remember that in her conversation Louise Quilici had made any statement to the effect that Mary Scossa had or owned any interest in the ranch, but during the recess, on April 28, in refreshing his memory, he recalled, in substance and effect, that on November 22, 1945, after the agreement had been signed and he had gone out on the porch, and had returned, that he then overheard her say, in the conversation between Mr. Koehler and Mrs. Quilici, that her sister, Mary Scossa, had an interest in the ranch. In cross-examination, Mr. Ross definitely questioned Masini upon that point, and Masini admitted he had formerly said that Mrs. Quilici had not mentioned the fact that Mary Scossa had an interest in the ranch, but Masini then admitted that he had remembered, after thinking the matter over, that she had so stated. Masini, in his testimony, stated and reiterated, both in direct and cross-examination, that he had not at any time heard Mrs. Quilici state, before the agreement or at any prior time, at the ranch, that Mary Scossa owned any interest therein; but the only mention she had made in regard to such fact was the one statement above mentioned, which was after the agreement was signed. Masini emphatically stated in his testimony that neither Louise Quilici nor Angelo Quilici nor Joseph Bednar had stated anything to that effect at the ranch prior to the trip to Koehler's residence. Masini also stated that neither Louise Quilici nor Angelo Quilici stated anything on that day, in the presence of Koehler or at all, indicating or to the effect that any court proceeding or approval was or would be required to sell or convey Mary Scossa's interest, the only reference at all

as to the interest of Mary Scossa being the mention made by Louise Quilici that her sister, Mary Scossa, owned an interest in the ranch, as above mentioned. The fact as testified to at the trial by Masini was, in effect, the same as that which he overheard on that afternoon of November 22, 1945, which, if correctly stated by Louise Quilici, was in accord with the factual situation as alleged repeatedly in the statements of fact and the theory expressed in the allegations of the answer and cross-complaint. This is stated without emphasizing the precise time when Louise Quilici then and there stated such fact to Mr. Koehler, either before or after the agreement was signed. This court is not so much concerned as to whether that statement was made by Louise Quilici and overheard by Masini on that occasion, *before or after* the signing of the agreement. The agreement was in the hands of Mr. Koehler, probably by the sanction of both parties without regard to whether or not Koehler was technically to be considered as attorney for Masini or for both parties. Doubtless, the execution of the agreement, and also its delivery, it is believed, may probably have been deemed uncompleted in accordance with the implied, or even the express, intention of the parties. This is presumed to be so in view of the fact that such a transaction should be considered as finally completed and delivered in accordance with the reasonably expressed or implied intention of the parties, and until the negotiations thereon could reasonably be considered terminated, the delivery should be deemed tentative only, and subject to be countermanded or recalled, or further revised or modified.

The question, however, in view, particularly, of the pleadings and the answer and cross-complaint, is as to whether or not Louise Quilici, in view of the allegations of her answer to the effect that on or about December 14, 1945, she *first learned* that she could not sell or convey the interest of Mary Scossa, but had theretofore believed she could, as guardian, sell and convey the same, and, in view of her entire ignorance of the fact that she

could not do so she had no reason to conceive it necessary to consider taking steps in such guardianship proceeding to obtain the approval of the court of such sale, she, nevertheless, did, in her testimony at the trial, on April 28, 1948, testify, in effect, that in discussing the matter with Koehler in the presence of Masini (who, as she testified, was sitting on the Chesterfield in the room, and within hearing distance), that she *first learned* of the necessity of *the approval, during the afternoon of November 22, 1945.* If she had ascertained same *November 22, 1945,* in discussing the matter with Mr. Koehler and when Masini was present, she certainly could not truthfully have said, in her verified answer seven months later, *June 22, 1946,* that she *first learned* of same on or about *December 14, 1945, which was about three weeks after November 22, 1945.* Mrs. Quilici, in connection with her verified answer and in her testimony has, in effect, placed herself in the unenviable position of indulging in highly contradictory and inconsistent statements, and which could not both be true. It appears imperative that we present herein a few of the many statements which are contained in the transcript of the testimony. Some of these are also incorporated on pages 41 and 42 of "Appellant's Opening Brief on Appeal," and are as follows:

"* * * I said, 'Now, my sister owns half of this ranch here. I don't own it all and it has to go through court because she is an incompetent. I was appointed her guardian.' *And Mr. Koehler, then he explained us the procedure, which I was surprised.* I didn't know we had to have the appraisers to appraise the value of the property and a lot of other things; that it had to be published in the paper; that it would take such a long time to make this sale go through. *At that time I didn't know a thing about it* until Mr. Koehler explained it to us." (Italics by appellant's counsel.) (Transcript of testimony, vol. II, p. 261, lines 3–12.)

Louise Quilici, in another portion of her testimony (see appellant's opening brief, p. 42), testified as follows:

"Q. What was your belief at that time as to your right to sell the undivided one-half interest of Mary Scossa?

*       *       *       *       *

"A. *I thought I had the authority to sell Mary's— my sister's property because I was appointed her guardian* and I thought that the Court wouldn't turn it down either; that I was just capable of doing it.

"Mr. Ross: (Q.) You felt that by virtue of your appointment as guardian you had the *unqualified* right to sell or dispose of the incompetent's share of the estate? A. Yes.

"Q. When did you learn that such was not truth? A. *November the 22nd, 1945 at Koehler's house.*

"Q. In Koehler's house? A. Yes." (Italics by appellant's counsel.) (Transcript of testimony, vol. II, p. 265, lines 22–30, and p. 266, lines 1–8.)

We have not undertaken here to detail this evidence further, but have carefully read all of same, including the testimony of respondent, Angelo Quilici, and of the witness Joseph Bednar.

It is sufficient to state that if the testimony of Angelo Quilici had been as stated by him, to the effect that at the ranch during the morning of November 22, 1945, Louise Quilici stated to Masini, in Angelo's presence, that "it has to be approved by the court before it can be sold," she certainly would have known about it, in order for her to have so stated. But she alleged in her verified answer that she first learned of it on or about December 14, 1945. If prior to December 14, 1945, she did not know it was necessary to petition for approval of the sale, she could not, of course, have informed Angelo Quilici of that which she did not know herself, namely, "that it has to be approved by the court before it can be sold." And it is very improbable that Angelo Quilici knew what she swore in her answer, that she did not know, or that he would have ascertained and testified to such fact. Bednar's testimony, in which he stated, in effect, that she made such statement at the ranch in the

morning of November 22, 1945, in view of the allegations of the answer as to her lack of any such knowledge or any such conception also is most improbable.

District Judge Hatton, in his carefully written opinion filed November 20, 1948, in case No. 3274, in the First judicial district court of the State of Nevada, in and for the county of Lyon, among other statements made therein, stated, commencing on page 37, line 23, vol. I of the bill of exceptions, the following:

"On Thanksgiving Day, November 22nd, 1945, the plaintiff visited the defendants at the said ranch property and made them an offer of $35,000.00 for the real and personal property. After some discussion, the price demanded by the defendants, of $40,000.00, was agreed upon. The defendants testified that, during the said discussion they informed the plaintiff that Mary Scossa owned a half interest in the ranch and that the sale of her interest would have to receive the approval of the Court in the guardianship proceeding. The testimony of the defendants was corroborated, on its face, by the testimony of Joseph Bednar, who testified that he was engaged in plumbing work in the bathroom adjoining the kitchen and overheard a portion of the conversation. Later, on the same day, the plaintiff and the defendant Angelo Quilici went to the office of Franklin Koehler, a practicing attorney at law, in Yerington, where Mr. Koehler prepared, in his handwriting the agreement referred to. In the afternoon of that day, the plaintiff and the defendants went to the residence of Mr. Koehler where a conversation was had between them and Mr. Koehler relative to the agreement, and the same was signed by the three parties. The defendants testified that, before the signing of the agreement, and in the conversation mentioned, the plaintiff was again informed as to the interest of Mary Scossa and that the sale would require the approval of the Court. The plaintiff, on the other hand, testified that, on the occasion mentioned and after the signing of the agreement, Mrs. Quilici stated that she was a trustee for Mary Scossa

and that she, Mrs. Quilici, could sell the property, and that this statement was the first information he received relative to the interest of Mary Scossa. The agreement was made in November, 1945, and this suit was commenced in June, 1946.

"As impeaching the testimony of the defendants and Bednar, the plaintiff directs attention to certain allegations in the defendants' answer and cross-complaint. At page 3, in paragraph VI, defendants allege that, at the time of making the agreement, they believed Mrs. Quilici could convey the interest of Mary Scossa, being only required thereafter to report to the Court and pay over to the estate of her sister one-half of the purchase price. This allegation, in substance, is repeated in paragraph II, page 4, in paragraph II, page 6 and in paragraph IV, page 8. In paragraph IV, page 5, it is alleged that on December 14th, 1945, she first learned that, as such guardian, she had no authority to convey her sister's interest except on approval of the Court. In paragraph II, page 6, it is alleged that the plaintiff assumed and believed that the entire title to the Scossa ranch was vested in the defendants. These allegations are all in conflict with the testimony of the defendants that, prior to entering into the agreement, the plaintiff was informed as to the interest of Mary Scossa and the necessity for Court approval on the sale of her interest.

"The affirmative defenses set up by the defendants involve a different theory from that on which they presented their defense on the trial. At the trial, their testimony was directed to an attempt to establish an oral condition precedent, namely, that it was understood and agreed that the sale contract should not be effective until it had been approved by the Court. This latter affirmative defense was not pleaded. The allegations of the verified answer and cross-complaint are so at variance with the testimony given by the defendants at the trial as to leave no basis for the supposed condition precedent. Under the condition of the pleadings, it may

be doubted if a finding of such a condition could be made even if the proofs justified it."

The plain and very apparent contradictions and inconsistencies appearing clearly before us in our consideration of the sworn allegations of fact in the answer of respondents, as compared to many of the statements of the respondents appearing in the record, impel us to state what seems to us to be, to say the least, a far departure from the essentials of honesty and truthfulness. We can do no less than has Judge Hatton in that we are unable to attach credence to the testimony of the respondents, in so far as the statements of fact contained in the testimony are not supported by any facts or circumstances existent in the answer or cross-complaint of the respondents.

We subscribe wholeheartedly to all that the learned district judge has stated in his opinion, commencing on page 37 of volume I of the record on appeal, at line 23, to and including line 30 of said page 37, also page 38 in its entirety, and, also, page 39, line 1 to and including line 23. Such original opinion not being a part of the record on appeal in this court, we refer, also, to the pages and lines of the original opinion as they appear in the file in the said district court, same being No. 3274.

Immediately following the last sentence of the portion of Judge Hatton's opinion to which reference is hereby made, the learned jurist has stated: *"There is left, for the Court to consider, the issue of fraud raised by the allegations of the complaint and the denials of the answer,* and the Court therefore has examined the evidence to see if, notwithstanding the contradictions between the defendants' pleading and their testimony, the plaintiff has established the allegation of fraud." (Italics ours.)

We agree with Judge Hatton's statement just above quoted in that respect, and shall, in our present opinion, disregard all of the above-mentioned inconsistent and contradictory statements referred to by him, and shall

consider further, and confine ourselves solely and exclusively to, matters alleged in the complaint and the denials of the answer and cross-complaint merely leaving for our consideration the issue of fraud.

Referring again to respondents' answer, paragraph VI, we have hereinbefore pointed out what we have characterized as a "negative pregnant." In other words, respondents, as we now interpret same in accordance with properly pleading the allegations of said paragraph VI, they have, in effect, alleged that the respondents did, impliedly, "* * * suppress and conceal from the plaintiff the fact that they were not the owners of the entire interest in the real estate and that the said Mary Scossa owned an interest therein," but that they have denied specifically that they did so fraudulently and in bad faith. Under certain circumstances, we might feel inclined, perhaps, to characterize the term "suppression and concealment" to mean that the literal meaning of same might be mitigated or ameliorated in its severity and harshness to the extent that no conscious or intentional concealment was intended. By way of attempting, in equity at least, to mitigate or excuse the alleged suppression and concealment, the respondents, and particularly the respondent, Louise Quilici, in said paragraph VI, have stated that they believed that "the defendant Louise Quilici, could sell and convey the undivided interest and estate of the incompetent, Mary Scossa, under her general powers as guardian of the person and estate of the incompetent, being required only to thereafter report her action to the Court and to pay over and into the estate of the incompetent one-half of the purchase price of the real and personal property referred to in the agreement of sale."

In view, however, of all of the matters which appear in the record, and particularly the facts and circumstances which we shall hereafter discuss, in relation to the respondents' "Petition for Authority to Sell Ward's Estate and for Order of Sale," and the "Order Denying Petition for Sale of Real Property," we feel impelled

seriously to analyze and carefully consider whether or not there was *intentional* concealment and suppression that should be deemed actually and intentionally fraudulent, or that there was only constructive fraud, or whether there was any fraud or bad faith at all.

On the second page of his opinion (Bill of Exceptions, vol. I, p. 34), Judge Hatton has stated: "The defendants, in their answer, deny and place in issue all of the allegations of the complaint relative to fraud and bad faith. They set up, as separate and distinct defenses, *impossibility* to convey the property to plaintiff, mutual mistake of the parties and nonexistence of the subject matter of the agreement. For a fifth and distinct defense and by way of cross-complaint, they allege a unilateral mistake of the defendants respecting their power to convey, upon which they seek the cancellation of the agreement. The Court has concluded that neither of these affirmative defenses, nor the cross-complaint, has been established by the proofs. While impossibility to convey is shown, such impossibility, standing alone, would not, as I view it, constitute a defense to plaintiff's claim." (Italics ours.)

It may be mentioned that "mutual mistake" as pleaded in the respondents' "Separate, Second and Distinct Defense" is entirely untenable. Masini was not informed, at the time of the transaction, November 22, 1945, that there was any serious doubt but that Louise Quilici, as she represented at the Koehler residence immediately subsequent to signing the agreement, would be enabled to convey the Mary Scossa interest. Certainly, in view of her representation at that time, she fully believed that she would be able to do so.

Even as to unilateral mistake, it is seriously questionable whether Louise Quilici had any reasonable right to believe that she, merely by her own action, would have the right to sell and convey her sister's one-half interest in the property. She must have known for about ten years, or at least had some idea, as guardian, that important proceedings must be authorized and sanctioned in

such guardianship proceedings, and must be approved by the district court. She, doubtless, knew that, since she commenced the guardianship proceedings back in 1936 and participated therein, all necessary papers and proceedings which had been filed, considered and action taken thereon had been approved by the court. Having even as much experience as she had in connection with Mary Scossa's interest, it would appear that she must have realized that an important sale such as the conveyance of property, particularly real estate, would require her attorney's services. It is incredible to believe that she did not entertain some degree of realization that, before completing such an agreement as the transaction with Masini, she should have sought the advice and counsel of her attorney, who had theretofore acted for her in other matters. Persons, very generally, understand and realize that they are required, for their own best interests in such matters, to seek counsel. This is accentuated by the fact that she had done so in the past. It has been so customary to realize, for example, in case one is ill, that the services of a skilled physician are essential to render necessary professional services, and. in case of a transaction involving legal matters that the advise of a competent and reliable attorney is necessary to enable one to protect his affairs, property and other interests, that it is difficult to believe that Louise Quilici was entirely ignorant in understanding that in such circumstances she should have contacted her attorney, and taken another day, or a few days if expedient or necessary, before relying upon her own judgment, and without, as it appears from the evidence, at least stating to Masini that she owned only a one-half interest in the property and the other one half was the property of her afflicted and incompetent sister. There is no substantial evidence, in our view, that, before the agreement was signed, at least, she even mentioned the interest of Mary Scossa. Furthermore, Mr. Koehler apparently had acted merely in the one transaction, and there is no testimony that Louise Quilici engaged or retained Mr. Koehler as

her attorney. It is more probable that Mr. Koehler acted merely at the mutual request of the parties, in drafting the agreement, and there is no substantial evidence that Louise Quilici even informed Mr. Koehler as to the matter of her sister Mary owning such interest, until after the agreement was executed. And, particularly in view of the pleadings and in view of the evidence, certainly there is, or can be found, no justification for any conclusion to the effect that Louise Quilici was misinformed as to her rights, nor it is reasonable to believe that she stated anything in Masini's presence that would have enabled him to have protected himself before entering into the transaction in question.

Judge Hatton, in his scholarly opinion, has referred to the subject of "Vendor and Purchaser," 55 Am.Jur., in sec. 555, page 949, after stating what is designated as the "benefit-of-bargain rule." As applied to executory contracts for the sale of lands, the text continues: "This is very generally recognized where the vendor cannot be said to have acted in good faith, as where, after the making of the contract, he disables himself by his own act or neglect from being able to convey, or where, having the ability to do so, he refuses to convey because of an advance in the value of the land or otherwise, or where he had knowledge of his want of or the defects in his title. When, however, the vendor has acted in good faith but is unable to carry out the contract because of some defect in the title, recovery by the purchaser for loss of his bargain is denied by the weight of authority."

Then Judge Hatton has referred to and quoted the "good faith rule," in sec. 557, at page 951, of 55 Am.Jur., as follows: "In many jurisdictions a distinction is made as regards the general damages recoverable by the purchaser under a land contract when the vendor is unable to convey between cases where the vendor acts in good faith in entering into the contract and those in which good faith is wanting. While it is generally recognized that the purchaser is entitled to recover the difference between the value of the land and the agreed price, to

recover for the loss of his bargain, where the vendor cannot be said to have acted in good faith, it is held, in cases where the vendor does act in good faith, that the measure of damages is the amount of the purchase money paid, with interest, thereby denying to the purchaser any recovery for the loss of his bargain. This is the rule laid down in the early English case of Flureau v. Thornhill, 2 W.Bl. 1078, 96 Eng.Reprint 635, decided in 1776 and subsequently followed in that country, and adopted in a majority of jurisdictions in this country and in Canada."

And the learned jurist has further referred to note 19, under the above text, under which supporting cases are cited, and also referred to 48 A.L.R. 19.

Also, Judge Hatton has considered and quoted the concluding portion of sec. 558, at p. 953, in 55 Am.Jur., as follows: "It is a difficult thing to ascertain whether or not a vendor is actuated by good faith in his refusal to convey. There can easily be frauds and deceits about it. The vendor is strongly tempted to avoid his agreement where there has been a rise in the value of the property. The purchaser, by making the contract, may lose other opportunities of making profitable investments. The vendor knows, when he contracts, his ability to convey a title, and the purchaser ordinarily does not. The vendor can provide in his contract against such a contingency as an unexpected inability to convey. He can also liquidate the damages by agreement. The measure of relief afforded by this rule is a fixed and definite thing. The other rule is not easily applied to all cases, and the books are burdened with discussions and refinements in relation to the modifications and restrictions and qualifications which, in different jurisdictions, have been annexed to it."

And in Crenshaw v. Williams, 191 Ky. 559, 231 S.W. 45, reported in 48 A.L.R., commencing at page 5, the decision is summarized in the syllabus as follows:

"1. A vendee of real estate is not entitled to damages for loss of his bargain upon inability of the vendor to

make good title, where the vendor acted in good faith and was guilty of no positive or active fraud in the transaction.

"2. Mere failure of a vendor of real estate to refer the vendee to his record muniments of title, or the judicial decisions bearing upon it, is not such fraud as to deprive him of the benefit of the rule that damages for loss of bargain will not be awarded against a good-faith vendor who is unable to convey a good title."

But, bearing in mind that, in this court's view, the crucial question is not so much the principle of the "benefit-of-bargain rule," or the "good faith rule," as is the application of those rules to the question now confronting us as to whether respondents have acted in good faith or in bad faith in respect to the actual facts and circumstances in the instant case, and particularly the question of law involved as to whether, in our determination and conclusion of the matter, the respondents acted in good faith, or in bad faith.

In that connection, we shall refer to the article upon the subject "Fraud and Deceit," 23 Am.Jur., sec. 80, pp. 857–858, as follows:

"Sec. 80.—Superior Knowledge or Means of Knowledge.—Knowledge that the other party to a contemplated transaction is acting under a mistaken belief as to certain facts is a factor in determining that a duty of disclosure is owing. There is much authority to the effect that if one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud, especially when the other party relies upon him to communicate to him the true state of facts to enable him to judge of the expediency of the bargain.

"Some courts have gone so far as to hold that each party is bound in every case to communicate to the other

his knowledge of material facts, provided he knows the other to be ignorant of them and they are not open and naked or equally within the reach of his observation, unless they are open to common observation, are apparent on inspection, are such as are not discoverable at first view, or are not visible to the eye. It has also been held that if a vendor of property knows, or has reasonable ground to believe, that unless he does make the disclosure the purchaser will be liable to be misled to his injury, then it is his duty in good conscience to make it; and if he does not make it, he is liable to the purchaser for the damages which the latter sustains."

It is very apparent that the respondents, in their dealings in regard to the transaction in question, acted with superior knowledge, which was not within the reasonable and fair reach of the other party, and which he could not discover by the exercise of reasonable diligence. In the instant case, Masini's means of knowledge being inferior, or the material facts not being equally within the reach of his observation, the respondents were under a serious obligation to speak. Their failure to do so "constitutes fraud, especially when the other party relies upon him to communicate to him the true state of facts to enable him to judge of the expediency of the bargain."

We refer, also, to Pomeroy's Equity Jurisprudence, fourth edition, vol. 2, upon the subject of "Actual Fraud," and that of "Constructive Fraud," commencing in sec. 872, on page 1800, and concluding with sec. 974, on page 2115. Reference now is made, particularly, to sec. 900, to and including section 902, pages 1870 to and including 1877. The writer of this opinion has, for many years, referred often to that very excellent and standard textbook, in regard, especially, to principles of equity in relation to fraud, both actual and constructive, mistake, impossibility of performance, and other kindred subjects.

Many indications appear from the testimony, and in certain matters appearing in the record, that the respondents did not exercise that consideration and solicitude for the appellant's interest as the appellant had

the right to believe that they reasonably could have done, nor such, in honesty and fair dealing, they were required, at least in equity, to do. They were so extremely negligent, in fact, especially as to Mrs. Quilici in concealing, or, at least, in failing to disclose fully the interest of her afflicted sister, Mary Scossa, that we wonder what any or all of the factors surrounding such relationship and that of her husband, Angelo Quilici, might have disclosed.

We are very much impressed, in view of the entire situation as same appears in the record, that the silence of respondents and their failure to disclose what Louise Quilici must have known, or could easily have determined by inquiring of her attorney, was not altogether inadvertent. Soon thereafter, Angelo Quilici stated to Masini that Louise Quilici had, in effect, changed her mind—that she did not wish to sell, and intended to return to Masini his money (the check for $5,000 Masini had paid to them, less the sum of $1,000 involved in a certain hay transaction, leaving $4,000). It may well be true that the reason of the concealment of the respondents was that they were not too sure whether or not they wished to carry through the transaction; that they might later wish to be excused, and might undertake to rescind same. Their vacillation was indicated by the fact that *very soon thereafter* Angelo said Louise did not wish to sell and convey the property. It is not at all improbable that they, or one of them, at least, may have been conscious of a mental reservation to the effect that Louise intended, therefore, not to make diligent effort to expedite, by proper legal proceedings, the sale of the interest of her sister, Mary Scossa, or, at least, that she might have preferred to leave the matter in abeyance as to commencing any proceedings to sell and convey Mary Scossa's interest, at least until she had further time and opportunity to make up her mind. So, her silence as to that phase of the matter *may* have been intentional throughout. Also, Angelo Quilici's disclosure that she did not wish to sell *may* have accentuated her

inclination not to sell such undivided one-half interest. Perhaps, as often comes to mind in dealing with such questions, the old-time figure of speech of "one wishing to have his cake and also to eat it too," occurs as appropriate.

So, before stating any definite determination as to the question of fraud, whether actual or constructive, we must analyze to a reasonable extent, and discuss, the matter of the application or "Petition for Authority to Sell Ward's Estate and for Order of Sale," subscribed and sworn to before John R. Ross, notary public, and filed the 14th day of December, 1945, and the "Order Denying Petition for Sale of Real Property," signed by the Honorable Clark J. Guild, district judge, and filed the 13th day of February, 1946.

The petition above mentioned presents to us, in our consideration of this case, a rather unusual situation, and especially so when we bear in mind that Angelo Quilici stated to Masini, upon the occasion of Masini's calling to see Quilici a few days after the agreement was signed, that Louise had said, in effect, that she had changed her mind and did not wish to sell the ranch, and intended or hoped soon to return the money to Masini which appellant had paid when the agreement was signed.

On page 133 of the transcript, vol. II, folio 397, Mr. Ross, attorney for respondents, asked Masini, on cross-examination (February 2, 1948, at the trial) :

"Q. (By Mr. Ross) And what did I say had to be done? A. (Masini) You told me you had to go through Court.

"Q. (Ross) Now, was that the first time that you knew about Mary's interest in the property? A. (Masini) No, I knew of it before that. I knew a few weeks afterwards—a few days. I kept going to the Ranch and Angelo told me to take my money back and Louise don't want to sell and anyhow I think it was they finally say on account of Mary's being in there they couldn't sell anyhow."

In that connection we will mention the observation of Judgè Hatton, in his opinion above mentioned, on page 40, folios 119–121, of the record on appeal, vol. I:

"It has been held that a vendor may not speculate on his contract of sale, proceeding on it if found to be profitable and repudiating it if unprofitable. The plaintiff testified that after the agreement was made and on his calling at the ranch, Mr. Quilici stated, in effect, that his wife had decided she did not wish to sell. It could well be that the defendants had learned that they had made a bad bargain, as indicated by the proofs, and that their desire to withdraw from the agreement was shown by statements made by Mr. Quilici. The evidence, however, does not indicate an attempt by defendants to repudiate the sale. *There was an inability to sell, independent of any wish on the part of the defendants.*

"An application was made in the guardianship matter to obtain the approval of the attempted sale. In view of the law on the subject (Stats.1945), that proceeding was futile, and, so far as the sale involved here is concerned, it would have been futile if the petition and the procedure thereon had been regular and had resulted in an order to sell the interest of Mary Scossa. The plaintiff was under no duty or obligation to bid at such a sale. The Court *does not consider* that the proceeding in the guardianship matter bears evidence of bad faith." (Italics ours.)

Those expressions by the learned judge present, to our minds, the crux of the matter. Was there fraud or bad faith on the part of the respondents in changing their minds as to the sale *and creating a situation indicating impossibility to sell,* or was their action *entirely in good faith, irrespective of the fact that,* in Judge Hatton's language, *"it has been held that a vendor may not speculate on his contract of sale, proceeding on it if found to be profitable and repudiating it if unprofitable;* and irrespective of the fact that *"it could well be that the defendants had learned that they had made a bad bargain, as*

*indicated by the proofs, and that their desire to with-draw from the agreement was shown by statements made by Mr. Quilici."* (Italics ours.)

We have a very high regard for Judge Hatton's views in such matters, and, to be entirely fair, reiterate the expression by the learned jurist that:

"The evidence, however, *does not indicate* an attempt by defendants to repudiate the sale. *There was an inability to sell, independent of any wish on the part of the defendants.*

"An application was made in the guardianship matter to obtain the approval of the attempted sale. In view of the law on the subject (Stats.1945), that proceeding was futile, and, so far as the sale involved here is concerned, it would have been futile if the petition and the procedure thereon had been regular and had resulted in an order to sell the interest of Mary Scossa." (Italics ours.)

The learned judge's above-mentioned conclusions are not facts, but, necessarily, constitute merely his honest convictions and conclusions, predicated largely of course, upon the theory urged by respondents' counsel. Much as we feel reluctant to do so, we are impelled to disagree with both the view and the conclusion that respondents took such steps, reasonably and with diligent effort, to have prepared sufficiently the proffered petition to sell the interest of the ward in the property mentioned, and to have diligently presented the necessary facts to have supported it.

We are impressed with the detailed presentation and arguments of appellant's counsel in appellant's opening brief. In their written argument II, B, 5, under the caption, *"Respondents abortive attempt to mitigate bad faith and fraud,"* appellant has ably and, as appears to us, clearly, stated the facts disclosing the *attempted* effort to place before the district judge, the Honorable Clark J. Guild, the alleged "Petition for Authority to Sell Ward's Estate and for Order of Sale," and the "Order Denying Petition for Sale of Real Property," and the facts and reasons which caused the attempted

order of sale to be denied. The contentions of counsel for appellant, in their argument in said brief, stating the alleged facts and descriptive acts and the steps alleged to have been taken by respondents, appear strongly indicative of a preconceived plan and intention on the part of the respondents to create, or bring about, a situation making futile and impossible the carrying out of the agreement of sale between the appellant and respondents as to the property, ostensibly owned by respondents, and which, it had been disclosed, upon or after the signing of such agreement, was equally owned by Mary Scossa, and which could not, due to Mary Scossa's incompetency, be disposed of or sold, because Louise Quilici, in view of the existing facts, could not, as guardian, convey the one-half interest of Mary Scossa in the property to L. Masini. On pages 49 to 53 of their opening brief, counsel for appellant have analyzed the matter very fully, and, we believe, clearly disclosed why certain usual facts necessary to show sufficient grounds for such sale of the interest of a ward in guardianship proceedings as would justify the court to order such sale, could properly have been stated, but were patently omitted, notwithstanding the fact that, in drafting such a petition, an attorney with the usual or ordinary amount of ability could readily, we believe, have sensed the necessity of showing such necessary grounds for the petition.

For instance, in the petition mentioned, the respondents' attorney, when requesting authority to carry through, in compliance with the Statutes of 1945, c. 57, the alleged sale, could, and should, we believe, have set forth the facts essential to have established that "it would be necessary or for the best interests of the ward to sell the real estate of the ward, in that the income from the ward's estate was insufficient to support and maintain the ward, or that it would be to the ward's benefit to reinvest the proceeds from the sale." It has not been shown that at the time of the hearing before Judge Guild and from which the order denying the sale

of the ward's interest resulted, any facts were presented as to why the proposed sale to Masini of the ward's one-half interest was, in proportion, below the price of $40,000 determined in the agreement. In fact, it was there set forth that the appraisers had appraised the ward's interest at $20,000, and, also, that Mrs. Katie D'Andrea, a sister of Mary Scossa, the incompetent, "appeared and objected * * * and her testimony" (contained in the "Order Denying Petition for Sale of Real Property") *"was taken in support of her objections which were based on the fact that the $12,500.00 that would be received by the estate of the incompetent on the basis of the Masini offer was far below the true value of the incompetent's interest in the premises which she testified to be worth at least $20,000.00."* (Italics ours.)

It should be emphasized that it was not the full price of $20,000 for Mary Scossa's interest to which there was any objection, but because the respondents, *by their own action not sufficiently explained in the petition, assumed,* by their allegations or statements in the petition, to separate the value of the ranch, priced by the agreement at $40,000 for the entire property, including both the real property and the personal property, to provide that the *land* should be apportioned at the price of $25,000, and the personal property, including the *machinery, equipment, livestock and crops,* should be apportioned at $15,000, leaving the total value of the ward's estate at only $12,500, instead of the amount of $20,000 as appraised. The amount of $12,500 for the ward's interest, being considerably less than even two-thirds of the total value of the one-half interest in the entire ranch, which would have been $13,333.33, Mary Scossa's interest on such basis of only $12,500 would have been $833.33 less than two thirds of the appraised value. Consequently, the order of sale was denied. "How easy it would have been" (in the words of appellant's counsel, on page 52 of their opening brief) "for the Quilicis to have increased their offer by $833.33 to bring it within the requirements of the statute if they had desired to

even put the court in a position to act formally on their petition!"

It appears necessary to include herein the statements made by Louise Quilici in her said petition (page 26 of the copy of "Petition for Authority to Sell Ward's Estate and for Order of Sale," in line 26, to and including page 28, line 14, same being folio 723, line 26, to and including folio 728, line 14, vol. II record on appeal, pp. 242–244) :

"That the entire estate of the incompetent consists of an undivided one-half interest in and to the Scossa Home Ranch, formerly known as the 'Herbold Ranch'; that there is no personal property and/or money belonging to the incompetent at the present time; that the sole income of the incompetent has been, and is, the rental your petitioner has paid to the estate for the use of her undivided one-half interest in said ranch.

"By way of explanation, petitioner points out to the Court that she is the owner of the other undivided one-half interest in the ranch referred to, and that petitioner and her husband have been in possession of, and have farmed the same, for more than ten years past; that all of the personal property on said ranch including machinery, livestock and crops is the separate property of petitioner and husband; that petitioner has filed her 'first account and report of guardian' which account and report will show the Court in detail the moneys received and disbursed by petitioner for and on account of the incompetent.

"That on or about the 22nd day of November, 1945, one Lawrence Masini entered into an agreement with petitioner to purchase the ranch owned by petitioner and Mary Scossa, the incompetent, as tenants in common. A true copy of the agreement is attached hereto, marked 'Exhibit A' and made a part hereof by reference. By virtue of said agreement the said Lawrence Masini agreed to pay the sum of $40,000.00 as full purchase price for said ranch together with all personal property, machinery, equipment, livestock and crops thereon. That

such offer was on the basis of $25,000.00 for the real property and $15,000.00 for the personal property, machinery, equipment, livestock, and crops then on the ranch belonging solely to petitioner and her husband; that on the basis of said offer the amount of money coming to the incompetent would be the sum of $12,-500.00.

"That the facts and circumstances upon which this petition is based are as follows: That as hereinabove stated, the entire estate of the incompetent consists of an undivided one-half interest in and to the Scossa Home Ranch of approximately 200 acres of land together with water rights, situate about one mile south of the City of Yerington, in Lyon County, Nevada; That petitioner is the owner of the other undivided one-half interest in said ranch; that petitioner and her husband are sole owners of all of the personal property on said ranch including machinery, equipment, livestock, and crops; that petitioner and her husband have for the past ten years farmed and operated said ranch paying rental to the incompetent for her share of the premises; that petitioner has accepted a payment of $5,000.00 from Masini and the balance of the purchase price is to be paid upon approval of the Court of the sale of the incompetent's interest; that the $12,500.00 which will be the incompetent's share of the purchase price can be invested and used for the support and maintenance of the incompetent."

The foregoing allegations and statements in the petition are self-evident, and further elucidation and comment seem superfluous.

Obviously, Mary Scossa's interest as to the personal property, including livestock, machinery and other things personal, could not be frittered away or confiscated or simply "taken" by the respondents, apparently without any legal action or any proceedings which are disclosed by any statements in the petition.

On page 27 of the petition, respondents, referring to

Mary Scossa, lines 13 to 16, inc., stated, as above quoted: "That on or about the 22nd day of November, 1945, one Lawrence Masini entered into an agreement with petitioner to purchase the ranch owned by petitioner and Mary Scossa, the incompetent, as tenants in common. A true copy of the agreement is attached hereto, marked 'Exhibit A' and made a part hereof by reference."

Under such facts and in view of the other unexplained portions of such petition to sell, it nowhere appears how the ownership or title of Mary Scossa's one-half interest as co-owner or tenant in common of the ranch, including the personal property, was, by any lawful or justifiable action, dispossessed from her, and had become, as to such personal property, possessed by Louise Quilici and her husband.

Admittedly, on page 27 of the petition, respondent, Louise Quilici, in lines 1 to 9, *"points out to the court that she is the owner of the other undivided one-half interest in the ranch* referred to, and that petitioner and her husband have been in possession of, and have farmed the same, for more than ten years past;" (Louise Quilici as a tenant in common, assisted by her husband, Angelo Quilici, apparently referring to Louise as tenant in common, the other co-tenant being Mary Scossa) *"that all of the personal property on said ranch including machinery, livestock and crops is the separate property of petitioner and husband."* And then it is stated, on pages 26–27, *"that the sole income of the incompetent has been, and is, the rental your petitioner has paid to the estate for the use of her undivided one-half interest in said ranch."*

By what means or method, in the absence of explanation, did "all of the personal property on said ranch including machinery, livestock and crops" become "the separate property of petitioner and husband"?

We are always solicitous that the interests of one under disability be carefully safeguarded. Undoubtedly this could, and should, have been done by respondents, fully and completely. We believe, however, that if a

sincere endeavor to accomplish such safeguarding had been diligently prosecuted by, or on behalf of, respondents, a proper adjustment could have been had, which undoubtedly would have preserved Mary Scossa's interest intact, without defeating the Masini agreement. A proper accounting, we believe, could have been had, which would have properly protected both the Quilicis and the ward, Mary Scossa. Furthermore, we have not been able to find from the evidence in the record any facts or any basis to establish that: "By virtue of said agreement the said Lawrence Masini agreed to pay the sum of $40,000.00 as full purchase price for said ranch together with all personal property, machinery, equipment, livestock and crops thereon. That such offer was on the basis of $25,000.00 for the real property and $15,000.00 for the personal property, machinery, equipment, livestock, and crops then on the ranch belonging solely to petitioner and her husband; that on the basis of said offer the amount of money coming to the incompetent would be the sum of $12,500.00."

Upon as full a consideration of the entire record as I have been able to give it, and I have studied same with due care and the desire to reach a correct determination and solution of the entire situation as appears in the record, I have been unable to discover or find that there is, or has been, good faith on the part of respondents, or that there has been an absence of fraud on their part.

As to respondents' theory, so strongly urged when Louise Quilici made oath to her answer and cross-complaint, June 20, 1946, to the effect that on or about December 14, 1945, first learning that she could not sell and convey the undivided interest of her ward filed her petition praying for an order to sell all of the right, title and interest of the said Mary Scossa, this court, it is believed, would have been much more willing to have believed and determined, in our opinion and decision, that there was an absence, at least of actual fraud and bad faith, were we not required to investigate the petition and proceedings in connection with the guardianship matter.

Judge Hatton, at the time of the trial, February 2, 1948, had before him, and considered, a copy of the proceedings in Judge Guild's court in relation to the petition to sell the ward's interest and the court denying such order of sale, and, notwithstanding the learned judge's opinion following the trial in the First judicial district court, in and for the county of Lyon, No. 3274, in which he referred to the clearly obvious contradictions and inconsistencies plainly apparent as between the allegations of said answer and cross-complaint to the effect that there was "suppression and concealment," in comparison to the very different theory advanced, for the first time at the trial, by the respondents, to the effect that the appellant, Masini, was repeatedly informed, by respondents and by the witness Bednar, that before a sale could be had the approval of the court was necessary, nevertheless, the learned jurist, confining the issues to the complaint of appellant and the denials of the answer and cross-complaint of respondents, stated, in said opinion, "there remains for the Court to consider, the issue of fraud." The able jurist, as to the question of fraud, failed to find fraud or bad faith. Referring to the fact that Judge Hatton discussed, as we have heretofore pointed out, that it was futile, or would have been, in view of the situation as shown by the facts of the petition and the order denying the petition to sell, and the difficulties involved, for the respondents to have accomplished the carrying through of the transaction between the appellant and respondents, the judge stated: "The Court does not consider that the proceedings in the guardianship matter bear evidence of bad faith." And, under the circumstances, that court, in effect, considered it *impossible to carry out the agreement.* On the other hand, we believe that there was, in our judgment, no such impossibility of performance as may have appeared. At least, it is our belief that if the respondents and their able attorney had, earnestly and in good faith (notwithstanding that Louise Quilici had told her husband and he had informed Masini that she did not wish to sell but would return Masini's money to him),

seen fit to have endeavored, with reasonable and due diligence, honestly and fairly to have accomplished the sale of Mary Scossa's interest, we can see no good and legitimate reason why it could not have been accomplished. We believe the paramount and only real difficulty which prevented the carrying out of the agreement was respondents' designed and clearly conceived intention not to do so.

It is believed that (in common parlance, if it may be so stated) the respondents determined, fraudulently and in bad faith, to "sabotage" the agreement, and thereby, intentionally and designedly, to make the carrying through of the agreement impossible of performance. *Such impossibility, we believe, was of their own wrongful volition and action, and for purely selfish purposes, and was, therefore, fraudulent.* Reversal is, therefore, inevitable.

The question remaining is, to what extent this court may properly indicate, upon sending the case back for a new trial, the disposition which should be made of it by the lower court. We find that there was *no repudiation on the part of appellant,* in his failure to accept the receipt by him of the check drawn in favor of Louise Quilici in the amount of $4,000, on or about November 22, 1945, and later returned, addressed by her to L. Masini, and inclosed in the envelope mailed by John R. Ross, Esq., attorney for respondents, with a letter on his letterhead, dated February 7, 1946, nor do we find any repudiation in the declination to accept the check, under the facts which we have fully considered nor in any of his acts in returning the said check to Louise Quilici, and which has been admitted for the purpose of the instant case.

This court should, we believe, upon returning the case, and all exhibits and all matters constituting the files thereof, to the court below, indicate to the court that, in view of the changing conditions which time has necessarily wrought, and in view of the practical and legal situation which the respective attorneys have impliedly,

if not expressly, indicated, it is our considered opinion that only the issue of damages should be considered and determined by the district court of the said First judicial district, in and for the county of Lyon. We have no desire, nor would we consider it proper, to indicate, in any degree, what the court should do as to the nature, or kind, of such proposed damages, nor what the extent or amount thereof should be. It may be that the court below may determine that the evidence before that court and in the record, in relation to damages, may, in that court's view, prove to be sufficient to enable such damages to be ascertained and determined, without trying the facts anew; or, on the other hand, the attorneys for one or both of the parties may desire further and additional evidence upon the question of damages, or some phase thereof, if the district court should so determine. That matter should and will be left entirely within the discretion of the court below, as will be, also, the matter of costs.

Upon the conclusion of a new trial in the lower court, and its findings and judgment, proper provision to the effect that the amount of $4,000 still in the hands of the respondents, and lawful interest at the rate of 7% per annum, from such time as that court shall determine, upon such principal amount, to be paid to the appellant should, of course, be included in the judgment, and, upon such judgment, interest and costs being hereafter fully paid by the respondents to the appellant, that such agreement of sale made and executed November 22, 1945, may be, if the lower court so finds, rescinded.

It is ordered, therefore, that the judgment of the First judicial district court of the State of Nevada, in and for the county of Lyon, and that court's order denying appellant's motion for a new trial, be, and are hereby, reversed, and that a new trial in the said district court be had, in accordance herewith.

BADT and EATHER, Justices (concurring specially).

We concur in the order of reversal and remand for new trial, limited to the issue of damages. The trial

court found in effect that there had been a concealment by the Quilicis of the fact of Mrs. Scossa's interest in the real estate (the record does not disclose that she owned any interest in the personalty) but that such concealment was not with fraudulent intent, and based its judgment for the defendants upon the one ground of impossibility of performance of. the contract. That there had been no reasonable and good faith efforts to perform on the part of the defendants is clear from the analysis in the foregoing opinion, of the proceedings had in the guardianship court (insofar as the real estate is concerned) and from a consideration of the applicable provisions of the code governing proceedings in the matter of guardians' sales. Our concurrence therefore is upon the sole ground that the court's sustaining of the defense of impossibility of performance was error.

### ON PETITION FOR REHEARING

July 25, 1950.

*Per Curiam:*

Rehearing denied.